**William L. CREEK, Jr. and Beverly Ann Creek, Individually and as Representatives of the Estate of Crystal Dawn Creek, Decedent, Appellants,**

v.

**The TEXAS STATE DEPARTMENT OF HIGHWAYS AND PUBLIC TRANSPORTATION, Appellee.**

No. C14–90–00957–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 19, 1992.

Rehearing Denied April 23, 1992.

Kevin Dubose, D'Lisa R. Simmons, Houston, for appellants.

Ronald E. Garner, Austin, for appellee.

Before ROBERTSON, SEARS and DRAUGHN, JJ.

OPINION

ROBERTSON, Justice.

This is a premise defect case under the Texas Tort Claims Act concerning an automobile accident at a rural intersection where a traffic control sign was in a down condition. Trial was to the jury and, upon

a failure to find that the state had notice of the condition of the sign, the trial court entered judgment for the state. The primary issue before us concerns the propriety of the jury question on the state's knowledge. Alternatively, appellants contend the jury's failure to find that the state had knowledge was incorrect as a matter of law, or as a further alternative, the failure to find was against the great weight of the evidence. We affirm.

The fatal accident occurred at the intersection of Farm to Market Roads 529 and 359 in rural Waller County. At approximately 1:30 a.m. on June 13, 1976, appellant William Creek (referred to hereafter only as appellant) was driving his automobile, occupied by his sleeping wife and young daughter, south on 359. At the same time Kevin O'Brien was driving his automobile, occupied by Cindae Walsh, east on 529.

FM 359 was not controlled by stop signs while FM 529 was so controlled. Approaching the intersection, O'Brien was faced with three signs: a route marker sign (notifying of the intersecting road), a directional sign giving directions to cities or towns and, some 700 feet prior to the intersection, a sign indicating a "stop ahead." However the stop sign for eastbound traffic on 529 was down and O'Brien proceeded through the intersection without stopping.[1] The two automobiles collided in the intersection, causing serious injuries to Mrs. Creek and fatal injuries to Crystal, the Creek's infant daughter.

Appellants originally filed suit in Harris County against O'Brien, Waller County and appellee. A plea to the jurisdiction by Waller County and appellee was granted. Subsequently the suit between appellants and O'Brien was settled and Waller County was non-suited.

The case proceeded to trial on Plaintiffs' Second Amended Petition alleging that the highway department "installed a defective stop sign, not fit for its intended use and knew or should have known of the condi-

tion of the stop sign." There was no allegation of gross negligence. Appellants' theory at trial was that this was a "negligent installation" case and issues on "condition and actual knowledge ... are not relevant...."

This theory is brought forward in appellants' first point of error in which they contend the trial court erred in submitting a question on the state's knowledge of a dangerous condition "because the state's knowledge of the dangerous condition was conclusively established as a matter of law." Appellants reason that the Texas Department of Highways improperly installed a stop sign at a highway intersection, which created a dangerous condition; because of this improper installation the stop sign fell over causing the collision. Having created the dangerous condition, the highway department had actual knowledge of the dangerous condition as a matter of law and, therefore, because the state had actual knowledge of the dangerous condition as a matter of law, the submission of the question of the state's knowledge of the dangerous condition was reversible error.

The trial court instructed the jury that dangerous condition meant "a condition, other than a hazard normally corrected (sic) with the use of the roadway, which is so dangerous that a person using ordinary care could not encounter such condition in safety." Question 1, inquiring whether "on the date of the subject accident a dangerous condition existed because of the manner of installation of the stop sign in question," was answered in the affirmative by the jury. In answer to the question 1a the jury found that such dangerous condition was a proximate cause of the collision. In answer to question 2, the jury failed to find that "the state had actual knowledge of the dangerous condition concerning the subject road." The jury answered the remaining issues favorably to appellants, finding damages in excess of the statutory limits. Both parties moved for judgment

1. Appellant testified he was driving 50 to 55 miles an hour, as he approached the intersection, and a defense accident reconstructionist estimated each of the automobiles was traveling approximately 47 miles per hour at point of impact.

on the verdict; the court entered judgment for the state. While appellants present the issue as a law point, a somewhat detailed statement of the evidence concerning the condition of the sign, its installation and the cause for its downed condition is appropriate.

### Condition of the Sign

The evidence concerning the condition of the sign at the time O'Brien came through the intersection was conflicting. Portions of the depositions of O'Brien and Walsh, his passenger, were read into evidence, but those portions were not copied by the court reporter nor do the actual depositions accompany the record on appeal. Colt Haack, one of appellants' witnesses, testified he drove through the intersection headed east (as did O'Brien) shortly before the accident and that at that time the stop sign "was down ... was laying on the ground." On cross-examination he stated that the stop sign was "angling up just a little bit." Appellant (Mr. Creek) testified that after the accident he examined the stop sign and it was "leaning over." However, on cross-examination he stated that he picked up the sign "entirely off the ground." Stephen Russ, a defense witness, testified he came upon the wreck moments after it had occurred and stopped to assist. After law enforcement officers arrived, one of them directed him to replace the stop sign in the hole from which it came. He testified that he, with the help of another person, did so and that the sign was lying in the ditch, parallel with the ditch, "a good 10 feet from the hole." DPS Trooper Krenek, an officer investigating the accident, testified they were never able to definitely establish whether the stop sign was only leaning or completely down.

### Installation of the Sign

Appellants' theory was that the stop sign was improperly installed because it did not have sufficient concrete around the two inch pipe to which the stop sign was secured to hold the sign upright. Again the evidence is conflicting. Appellant testified that he examined the base of the sign and it had a "ball" of concrete approximately 4 to 6 inches in depth and 8 to 10 inches in diameter attached to the pipe. Joe Nix, a consultant in traffic engineering work, testified as an expert on behalf of appellants. He stated that the state has adopted a manual on uniform traffic control devices, but that it does not specify how deep stop signs are to be in the ground nor how much concrete was to be placed around the pipe holding the sign. Instead, it only requires the sign post to be put in "rigidly to withstand pressures put on it." However, he stated that according to the testimony of Mr. Lipscomb (which testimony he was aware of), the standards of the highway department in this particular area of the state called for a minimum of 24 inches of concrete. He opinioned that if "the standards are not met then the sign is obviously not properly installed" and "subject to any number of vandals, wind, and not be able to withstand the resistance." He concluded that the subject sign was "not properly installed," that such installation was negligent and because the employees of the highway department installed it, the highway department would have been on notice from the very beginning of the installation that the sign was not properly installed. He stated "I would not guess that that sign had been in place more than a month."

While it was his opinion that the stop sign just fell down, he acknowledged that if it did so "I would expect to see the stop sign itself, the end of the pole very close to the hole," and that if the pole was ten feet from the hole, "then that would be a pretty good indication that that [stop sign] didn't just fall down." Finally he concluded that before this accident there was nothing to put the highway department on notice that it had a particularly dangerous problem with this intersection.

John Lipscomb, an engineer with Texas A & M Engineering Extension Service, testified as an expert witness on behalf of the highway department. He had previously been a district engineer for the Houston District of the Highway Department (the district where the accident happened) for some 24 years. He stated that while route marker supports have explicit standards

for foundation supports, there are no standards for stop signs either as to size of pipe, depth of hole or amount of concrete. These matters, he stated, are "primarily left up to the man in the field who actually makes the installation and has the experience with the soil conditions of the local area," and that while he was district engineer his office did not impose on Mr. Heise or Mr. Schulz a standard for the amount of concrete to be used. On cross examination he stated that while there is no "specific standard on how employees set the stop signs," his personal "standard" was "24 to 36 inches." He stated in his years of experience he had never seen a stop sign knocked down by the wind.

Stephen Russ testified that when he righted the sign at the direction of the officers, he estimated a "good 18 inches of concrete," and "could have been more" on the bottom of the sign pole. He stated that he and Robbins placed the sign post back into the hole in the ground "a little over a foot" but that because dirt was in the hole it did not go further down.

Robert Schulz, the maintenance foreman for the highway department for some 30 years prior to retirement, stated that he was sure an employee of his (while he was with the department) installed the stop sign in question, but he didn't know when. He stated that if there had been a repair of the sign a month or so before the accident, the 36 inch stop sign in question would have been replaced with a 48 inch stop sign, the same as the sign on the opposite side of the intersection. This was so, he stated, because all of the 36 inch signs in rural Waller County were being replaced with 48 inch signs when those signs "went bad or had to be repaired." He stated further there had never been any trouble with the subject stop sign and that he went through the intersection "probably three times a week."

Portions of the deposition of August Heise were read into evidence. Prior to retirement in 1983, he had worked for the highway department for some 16 years, the last 13 of which he worked on signal lights and signs. His job was to ride the roads in his area and check all the signs. He testified he rode through the subject intersection, which was in his area, twice a day, five days a week and that he could not remember any of the stop signs being down at that intersection. He testified that there was not a standard depth to the holes in which he placed stop signs, nor the amount of concrete placed in the hole around the pipe, but that "we put them up the way where we thought they would be safe and substantial," which meant they "usually [had] about 24 to 28 inches [of concrete] on those small poles." However, the amount of concrete used depended upon the ground—if it was a well drained area, less concrete was used.

### Cause of the Down Condition of the Stop Sign

Again, the cause of the stop sign being down was in dispute. Appellants' theory was that the sign just fell down because it was improperly installed. The state's theory was that vandals had knocked the sign down. Some evidence supporting and contradicting these theories has been outlined above, and in addition, the following evidence suggesting vandalism was provided. Appellant acknowledged a relatively thin black mark "going basically straight up and down the pipe" but he had "no idea" what caused it. Stephen Russ stated that when he was replacing the stop sign following the accident, he tried to determine why the sign was down and "there looked like a track, a tire track that was backed up to the sign." John Lipscomb testified that while the stop sign pole did not have "a kink" which would indicate it was hit at a high speed, he stated there was "a mark" on the pole which could have been caused by contact with the pole.

When the proposed charge was provided to trial counsel, appellants strenuously objected to the submission of Question 2 inquiring whether the state had actual knowledge of the dangerous condition. Their argument then, as now, is that the dangerous condition arose from the improper installation of the stop sign, and that since the evidence was undisputed that the state installed the stop sign, it created the

dangerous condition and, as a matter of law, had actual knowledge of the dangerous condition. To support their straightforward theory, appellants rely upon language from two cases—*County of Harris v. Eaton,* 573 S.W.2d 177 (Tex.1978) and *State v. McBride,* 601 S.W.2d 552 (Tex.Civ. App.—Waco 1980, writ ref'd, n.r.e.)—to the effect that if the government created the condition it will have actual knowledge of its existence. Both *Eaton* and *McBride* were special defect cases. A different rule governs the case before us.

Section 101.021 of the Tort Claims Act (Sec. 3(b) of the Act prior to codification) provides, among other things, that a governmental unit in the state is liable for "personal injury and death so caused by a *condition* ... of tangible personal or real property...." (emphasis supplied). TEX. CIV.PROC. & REM.CODE ANN. § 101.021 (Vernon 1986).

Section 101.022 of the Act provides:

(a) If a claim arises from a premise defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises.

(b) The limitation of duty in this section does not apply to the duty to warn of special defects such as excavations or obstruction on highways, roads, or streets or to the duty to warn of the absence, condition, or malfunction of traffic signs, signals, or warning devices as is required by Section 101.060.

TEX.CIV.PROC. & REM.CODE ANN. § 101.022 (Vernon 1986).

The effect of subsection (b) is to place a greater duty to warn of (1) special defects or (2) the absence, condition or malfunction of traffic signs "as is required by Section 101.060." However, section 101.060 provides that the act does not apply and therefore governmental immunity is not waived where the claim arises from:

．　　．　　．　　．　　．

(2) the absence, condition, or malfunction of a traffic or road sign, signal, or warning device unless the absence, condition, or malfunction is not corrected by the

responsible governmental unit within a reasonable time after notice; or

(3) the removal or destruction of a traffic or road sign, signal, or warning device by a third person unless the governmental unit fails to correct the removal or destruction within a reasonable time after actual notice.

．　　．　　．　　．　　．

TEX.CIV.PROC. & REM.CODE ANN. § 101.060 (Vernon 1986).

An almost identical situation on strikingly similar facts was presented in *Lawson v. Estate of McDonald,* 524 S.W.2d 351 (Tex. Civ.App.—Waco 1975, writ ref'd n.r.e.). There the fatal accident occurred at intersecting rural farm to market roads. A stop sign facing the defendant (McDonald) in that case had been removed by vandals "sometime after 3:00 p.m. the day before the day in question, and it was not in place at the time of the collision." He was not familiar with the intersection; he did not stop, and the fatal accident resulted. Plaintiffs filed suit against both Mr. McDonald's estate and the state, basing their claim against the state upon the "condition" of the stop sign, asserting that the sign was a dangerous condition because it was easily removable, and that the highway department was aware of the condition. At the close of evidence, the trial court granted the state's motion for instructed verdict. This action was assigned as error on appeal.

The court set out the salient facts concerning the sign, and because the theory there so closely resembles the theory here, they are quoted as follows:

The evidence shows that the road signs controlling the intersection involved, including the stop sign in question, are attached to the single pole upon which each is placed with two U-bolts, and can be easily removed therefrom with a crescent wrench; and that the poles are not directly set in concrete, but are threaded onto a base near the ground, and can also be removed with a wrench. The signs and poles would be more difficult to remove if they were tackwelded.

More time would be required to remove the signs if each was placed on two poles instead of one. The signs most often stolen by vandals are stop signs and signs giving road numbers. Sign vandalism at this intersection has been worse than at other intersections on FR 1604; and prior to the date in question vandals had stolen stop signs and other signs from the intersection, although there has been no established frequently of such vandalism. The proper officials of the State Highway Department are aware of all of these facts.

*Id.*

The court upheld the instructed verdict in favor of the state, reasoning that the "condition" referred to in the statute was not intended to refer "to the state's installation or maintenance of a sign or signal." Rather, the court said, "the term refers to the maintenance of a sign or signal in a condition sufficient to properly perform the function of traffic control for which it is relied upon by the travelling public." We believe that on the record before us this reasoning controls the disposition of this case. Other than the statement of the witness Nix that he "would not guess that the sign had been in place more than a month," the evidence indicates that the sign had been in place for years; the sign had never been in a downed condition in the memory of the man whose duty it was to maintain the sign and there was absolutely no testimony that the highway department had notice, as required by Sec. 101.060, of the absence or downed condition of the sign. Following the reasoning of the court in *Lawson,* we hold, that "condition ... of ... property" contained in Sec. 101.021 of the Act does not refer to the original installation of a stop sign insofar as whether it was imbedded in a sufficient amount of concrete or in a hole of sufficient depth.

Since the Texas Tort Claims Act will hold the state liable only if it has knowledge that a sign is not performing its function, the jury's failure to find that the state had actual knowledge of the dangerous condition was not incorrect as a matter of law nor against the great weight and preponderance of the evidence. No evidence was produced, nor does appellant allege, that the state had actual knowledge that the stop sign was down. Therefore, we overrule appellant's second and third points of error.

We affirm the judgment.

DRAUGHN, Justice, dissenting.

I respectfully dissent. The jury found in answer to Question 1 that a dangerous condition existed on the occasion in question because of the manner of installation of the stop sign. The state installed the stop sign. Probative evidence supported the jury's answer to this question. That evidence showed there was not sufficient concrete on the base of the stop sign to support it according to industry standards. The state vigorously disputed this evidence, but the jury answered it adversely to the state, and that closes the matter. The state created a dangerous condition not visible to the driving public. This dangerous condition proximately caused serious injury and death to members of that driving public. In my opinion, the state cannot escape liability because it did not get actual notice shortly before the dangerous condition caused these tragic results. The state was charged with the responsibility of installing safe, well-anchored stop signs. The jury found the state failed to do so, and the state should respond in damages for the Creeks' injuries and for the death of their child.

To hold otherwise, in my opinion, sets up a ticking-time-bomb theory of liability avoidance for the state. It allows the state to set in place a potentially dangerous hidden condition and to escape liability therefor, if the state receives no actual notice right before it "explodes" and causes injury or death. The state's employees installed the defective stop sign and created the dangerous condition. The state is charged with knowledge of what they do. The mere passage of time should not relieve the state of responsibility for the foreseeable consequences of that knowledge.

I would reverse and render judgment for appellants for the appropriate maximum damages allowable under the Texas Tort Claims Act as applied to the damages found by the jury.