Reversed and Rendered and Opinion filed October 20, 2005









Reversed
and Rendered and Opinion filed October 20, 2005.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-04-00501-CV

____________

 

PRAIRIE VIEW
A&M UNIVERSITY AND 

BILL
TURNER D/B/A TURNER MECHANICAL SERVICES, Appellants

 

V.

 

EDDIE RAY BROOKS, Appellee

 



 

On Appeal from the 9th
District Court

Waller County, Texas

Trial Court Cause No. 01-07-15997

 



 

O P I N I O N








Prairie View A&M University (the AUniversity@) appeals a
judgment granted in favor of Eddie Ray Brooks for injuries Brooks sustained
while repairing a pipe on the University=s campus.  After conducting a legal sufficiency review
of the evidence introduced at trial, we conclude there is no evidence that the
University had actual knowledge of the dangerous condition that resulted in
Brooks= injury.  For this reason, Brooks cannot establish a
waiver of sovereign immunity under the Texas Tort Claims Act (ATTCA@), and the trial
court lacked jurisdiction to enter judgment. 
We accordingly reverse the judgment of the trial court and render
judgment dismissing the case for lack of jurisdiction.

                        I. 
Factual and Procedural Background 

The University hires contractors to
maintain and service many of its mechanical systems.  Appellant Bill Turner, d/b/a Turner
Mechanical Services (ATurner@), was one of
these contractors and at the time of trial had been servicing systems at the
University sporadically for thirty years. 
In October 2000, Turner had a maintenance contract with the University
to maintain and repair the University=s steam delivery
system, among other systems.  Appellee
Eddie Ray Brooks was an independent contractor working for Turner.  At the time of trial, Brooks had worked for
Turner for approximately ten years, doing most of his work on the University=s campus.

Because of the length of time that Turner
and Brooks had worked on the University=s campus, they
knew some of the University=s employees
well.  Aaron Watson was the University=s Plant
Superintendent and had worked for the University for twenty-eight years.  Charles Muse was the University=s Chief Engineer
and had worked for the University for 
twelve years.  The testimony at
trial established that Turner and Brooks had known and worked around Watson and
Muse for a long time.  In fact, at the
time of the incident in this case, Watson=s cousin was
actually working on Turner=s crew.

A.      The
University=s Health Center Valve Begins Leaking.

On October 25, 2000, Watson went to the
University=s Health Center and heard steam
venting.  He investigated the sound and
determined that the steam valve at the Health Center (AHealth Center
Valve@) was leaking and
needed to be repaired.  He contacted his
supervisor, Muse, to inform him of the situation.  Turner was contacted to perform the
repair.  








The Health Center Valve needed to be
isolated prior to beginning the repair. 
Watson first tried to secure the Health Center Valve by heading upstream
on the campus steam system to find an upstream isolation valve that would
deprive the Health Center of its supply of steam.  The first upstream isolation valve that
Watson tried was at Evans Hall (AEvans Isolation
Valve@).  The Evans Isolation Valve was not working;
although Watson tried to turn the valve, it would not close.  Watson admitted that he had difficulties with
the Evans Isolation Valve in the past, and he knew when he tried to turn it off
that it probably would not work.

When Watson failed to secure the broken
Health Center Valve by shutting off the Evans Isolation Valve, he went further
upstream to find the next isolation valve that was in working order.  The second isolation valve that Watson
approached was the isolation valve for a low pressure line that provided steam
and heat to the southwest campus (ASouthwest
Isolation Valve@). 
Under Watson=s supervision, a colleague used a pipe
wrench to shut off the Southwest Isolation Valve.  Watson testified that shutting off this
isolation valve should have deprived steam to the low pressure line feeding
steam to the southwest campus, which included the broken Health Center
Valve.  Watson further testified that he
believed he had in fact shut down the steam that fed the broken Health Center
Valve by turning off the Southwest Isolation Valve, and thereafter, he called
his supervisor, Muse, to inform him that the steam to the southwest campus had
been shut off.

Watson testified that, when he shut off
the Southwest Isolation Valve, he heard or felt some turbulence in the
pipe.  Turbulence is the movement of
steam through the pipes, and the turbulence or change in pressure that may be
heard or felt when a valve is turned can predict whether a valve was effective
in shutting off steam.[1]








B.      Turner=s Crew Arrives to
Repair the Valve.

The next morning, Turner and his crew
showed up to repair the leaking Health Center valve.  Muse told Turner that the steam feeding the
southwest campus had been shut off, and Turner informed his crew of this fact.  In addition, Watson may have told Turner=s crew that the
steam had been shut off.  Turner=s crew accordingly
began to repair the broken valve.  

Repair work began, but Turner=s crew, which that
morning included Watson=s cousin, was having difficulty reaching
the bolts that needed to be removed to perform the repair.  Because of Brooks= relatively small
size, Brooks climbed into the pit where the valve was located to assist with
the repair.  Brooks first checked the
pipe leading to the broken valve to confirm that it was cool to the touch.  A pipe being fed with steam would ordinarily
be so hot that a person could not touch it, but could instead feel the heat
inches away from the pipe.  The fact that
the pipe was cold assured Brooks that steam was not present in the pipe.

Brooks began his work by hammering two
bolts on the pipe in order to remove the valve. 
When this effort was unsuccessful, he began to use his cutting
torch.  After working on the first bolt
with his torch, he broke the first bolt loose with his hammer, and a small
amount of water dripped out of it, again suggesting that there was no steam in
the pipe.  He then began cutting the
second bolt.  When he was finished, he
extinguished his cutting torch.  At this
point, steam exploded from the pipe and burned Brooks.  His coworkers removed him from the pit, and
after assessing his injuries, took him to the local hospital.

C.      An
Open Bypass Line Caused the Accident 

The testimony in the record indicates that
Watson should have been able to shut off the steam to the southwest campus by
closing the Southwest Isolation Valve. 
The Southwest Isolation Valve should have closed off the low pressure
line that fed steam to the southwest campus, including the Health Center.  If steam was not being fed to the University=s southwest
campus, the broken Health Center Valve should have been safe to repair.








But, the low pressure line feeding the
southwest campus was not the only steam line on the University=s campus.  Alumni Hall, which housed the University=s dining
facilities, also received steam from a second line, a high pressure line, used
to power the cooking kettles in the Alumni Hall kitchen.  Although the Southwest Isolation Valve was
located near this high pressure line, Watson testified that he did not believe
that there was any reason to also turn off this second, high pressure
line.  By design, this second, high
pressure line existed for the purpose of feeding the cooking kettles, and not
to supply steam to the low pressure line feeding the southwest campus.

Apparently, however, a bypass line had
been created for the purpose of providing backup steam to the cooking kettles
(the ABypass Line@) in the event
that there was a problem with the high pressure line ordinarily used for this
purpose.  The Bypass Line tied the low
pressure line and the high pressure line together, so that steam from the low
pressure line could be used to power the cooking kettles if necessary.  Because the Bypass Line tied into the low
pressure line past the point of the Southwest Isolation Valve, it had the
potential to permit steam to enter the low pressure line that should have been
isolated by shutting the Southwest Isolation Valve.

This is in fact what occurred when steam
severely burned Brooks during the repair of the Health Center Valve.  After the incident, the University determined
that the Bypass Line was open, permitting steam from the high pressure line to
escape into the low pressure line feeding the southwest campus, and
accordingly, to the broken Health Center Valve which Brooks had been
repairing.  The reason that this pipe had
been cold to Brooks= touch was likely that someone had turned
off the broken Health Center Valve, preventing steam in the line from traveling
in this direction.  When Brooks
effectively reopened this valve by knocking the bolts off of the pipe, steam
from the high pressure line entered the low pressure line feeding the southwest
campus and escaped to burn Brooks.








D.      What
the University Knew About the Bypass Line.

Whether the University had actual
knowledge of the Bypass Line was a subject of dispute at trial.  Watson and Muse both denied knowledge of the
Bypass Line,  testifying that they were
not aware of its existence in the complex maze of piping underneath Alumni
Hall.[2]  According to them, the Bypass Line was not
supposed to exist. 

Although there was no testimony indicating
that Muse had actual knowledge of the Bypass Line, Turner directly contradicted
Watson=s testimony that
Watson did not know  the line
existed.  Turner had installed the Bypass
Line about a year and a half earlier. 
Turner testified he believed Watson was aware of the existence of the
Bypass Line because he recalled that Watson was present at the Bypass Line=s fabrication and
installation.  Turner also testified that
he would not have installed this line without Watson=s permission,
therefore he believed Watson must have been aware of the Bypass Line. 








There was no testimony at trial that
anyone at the University had actual knowledge that the Bypass Line created the
dangerous condition of permitting steam to enter the low pressure line that
supplied the southwest campus.  For
example, there was no testimony that Watson or Muse or anyone else at the
University knew that the Bypass Line had been turned on, as opposed to
remaining in an Aoff@ position for
as-needed use.  According to Turner, the
Bypass Line could be turned on and off by a valve on the line itself.  Turner testified that the Bypass Line valve
should not have been turned on and that the Bypass Line itself should not have
been open.  At the time of the incident,
the high pressure line feeding the cooking kettles was on and working, so there
was no need to open the Bypass Line to obtain additional steam from the low
pressure line.  Turner stated that he did
not know who had turned the Bypass Line on, but Turner acknowledged that
Marriott, one of the University=s cooking
contractors, opened and closed valves they needed for cooking regularly.

In addition, there was no testimony that
Watson or Muse understood that the Bypass Line, which was not part of the
piping system=s original design, connected to the low
pressure line downstream of the Southwest Isolation Valve, rendering this valve
ineffective as an isolating mechanism. 
Watson testified that he believed he had adequately shut off the steam
to the southwest campus by turning off the Southwest Isolation Valve.  No one contradicted Watson=s testimony, and
there is no testimony indicating that Watson had actual knowledge of the
presence of steam in the pipes leading to the valve that needed to be repaired.


E.      Brooks= Lawsuit Against
the University.

Brooks sued the University to recover for
his injuries.  Brooks= pleadings allege
that the University was negligent by failing to shut off all the steam flowing
through the piping system.  Brooks also
alleged a waiver of sovereign immunity because Brooks= claim involved
personal injury caused by the condition or use of property.

By its answer, the University asserted Afull sovereign
immunity from suit and liability,@ and specifically
denied that Brooks had asserted a claim under ' 101.021 of the
TTCA.  The University also asserted a
third-party claim against Turner for contribution, bringing him into the suit.[3]  Thereafter, with respect to its assertion of
sovereign immunity, the University filed special exceptions, arguing that
Brooks had failed to clearly plead a claim that was actionable under the TTCA
and requesting that the court either require Brooks to replead or dismiss the
action.








Brooks filed an amended pleading in
response, alleging alternative theories under the TTCA.  He claimed that the University waived
immunity because the use or misuse of the piping and shut-off valves constituted
the negligent use or misuse of either tangible personal or real property.  He also alleged that the University was
responsible as an owner of defective or improperly designed real property, by
failing to replace broken valves and by creating a bypass line.  At no point did Brooks allege in his
pleadings that the University had actual knowledge of a dangerous condition
existing on the University=s campus.

In response, the University filed a second
set of special exceptions, again arguing that plaintiff=s pleadings were
inadequate, and stating:

Defendant would
move that the allegations be stricken and that Plaintiff be required to plead
with specificity the alleged dangerous condition of the premises in question.

(Defendant, Prairie View A&M University=s Special
Exceptions to Plaintiff=s Second Amended Petition (emphasis
original)).

We cannot determine from the record on
appeal whether the trial court considered the issue of sovereign immunity prior
to trial.  Apparently the trial court did
not rule on the University=s special
exceptions until after the first witness, Watson, had testified, at which time
the court simply noted on the record that A[i]t=s denied.@  Prior to the close of the evidence, neither
the trial court, nor the parties, focused on the issue of what the alleged
dangerous condition was, or whether the University had actual knowledge of it.








At trial, Brooks sought to establish
various lapses on the University=s part.  Calling Watson adversely as his first
witness, Brooks established among other things that Watson failed to follow
University procedures precisely in attempting to secure the leaking valve;[4]
that there was no updated master diagram detailing the University=s steam system,
which valves were broken, and which valves needed to be shut off in order to
effectively isolate part of the system; and that, if the first isolation valve
Watson had approached, the Evans Isolation Valve, had been working, the accident
would not have occurred.

At the close of the evidence, the
University again urged the issue of sovereign immunity, arguing in a motion for
a directed verdict that the evidence failed to establish a waiver of immunity
under a premises theory.  Among other
things, the University challenged the existence of a dangerous condition and
claimed that there was no evidence it had actual knowledge of the condition
that caused the injury.  The court took
this motion under advisement, and postponed a ruling on the various issues
raised until after the jury had returned a verdict.

The parties submitted the case to the jury
solely under a premises theory.  The
charge expressly instructed the jury Athat the only
allegedly dangerous condition was steam in the pipes.@  The charge further instructed the jury that
the University was negligent with respect to the condition of the premises if,
among other things, APrairie View A&M University had actual
knowledge of the danger.@[5]








The jury returned a verdict for Brooks,
finding the University and Turner were negligent, but Brooks was not.  The University and Turner both moved for
judgment notwithstanding the verdict. 
The University again argued that it had no actual knowledge of the
dangerous condition and that the evidence was legally and factually insufficient
to support the jury=s verdict. 
The court denied these motions and entered a final judgment.  The University and Turner appealed.

                                                    II. 
Analysis  

The University raises five issues on
appeal, asserting that (1)
Chapter 95 of the Civil Practice and Remedies Code imposes additional
limitations on the TTCA=s waiver of sovereign immunity, (2) Brooks failed to
establish that the University had actual knowledge of the dangerous condition
that caused his injuries, (3) the TTCA does not provide a cause of action based
on the failure to use property, (4) the TTCA does not provide a cause of action
based on a discretionary budgetary decision, and (5) the TTCA does not provide
a cause of action based on an improperly designed piping system.

We sustain the University=s second issue and hold  the evidence is legally insufficient to
establish that the University had actual knowledge of the dangerous condition
that caused Brooks= injury.[6]  Accordingly, there is no waiver of sovereign
immunity under the TTCA, and we must render judgment dismissing the case for
lack of jurisdiction.  Because dismissal
is appropriate, we do not address the University=s remaining issues on appeal.  Similarly, because the only claim against
Turner is the University=s third-party claim for contribution, which is derivative of
Brooks= claim against the University, it is
unnecessary to address the issues Turner has raised on appeal.

A.      A
Court Must Address Subject Matter Jurisdiction.








The Texas Supreme Court has recently
reiterated that courts must address questions of subject matter jurisdiction at
the Aearliest
opportunity@ to do so. 
Tex. Dep=t of Parks & Wildlife v. Miranda, 133 S.W.3d 217,
226 (Tex. 2004).  This is because such
questions implicate a court=s authority to
act.  Id.; see also Harris
County v. Sykes, 136 S.W.3d 635, 638 (Tex. 2004).  For the same reason, questions of jurisdiction
Acannot be waived,
and may be raised for the first time on appeal.@  See Waco Indep. Sch. Dist. v. Gibson,
22 S.W.3d 849, 850 (Tex. 2000) (holding that it was error for appellate court
to decline to address  jurisdiction on
ground that issue had not been preserved for review Abecause subject
matter jurisdiction is essential to the authority of a court to decide a case@).

Here, the University asserts its sovereign
immunity, arguing that the TTCA=s limited waiver
of immunity does not apply in this case. 
This allegation raises a question of subject matter jurisdiction that we
must address as a preliminary matter on appeal.[7]  See Miranda, 133 S.W.3d at 224
(detailing the procedure for raising, and ruling on, a plea to the jurisdiction
based on a waiver of sovereign immunity under the TTCA); Gibson, 22
S.W.3d at 850.  Courts must remain Amindful that this
[jurisdictional] determination must be made as soon as practicable,@ utilizing their
discretion to assess jurisdiction promptly, given the needs of a particular
case.  Miranda, 133 S.W.3d at 227.








The TTCA=s limited waiver
of sovereign immunity, Tex. Civ. Prac.
& Rem. Code '' 101.001‑.109, provides that
immunity from suit and immunity from liability are co-extensive.  Id. at ' 101.025 (ASovereign immunity
to suit is waived and abolished to the extent of liability created by this
chapter.@); see also
Miranda, 133 S.W.3d at 224.  This
provision effectively creates a situation in which evaluating whether subject
matter jurisdiction exists in a given case may require a court to examine the
merits of a plaintiff=s claims. 
Id. at 226.  We are faced
with such a circumstance here, and we must determine whether jurisdiction
exists by examining the elements of Brooks= claim under the
TTCA.

Brooks= claim against the
University was tried to the jury.  It is
not clear from the record why jurisdictional questions were not addressed at an
earlier stage of the proceedings, such as the pleading stage or by a motion for
summary judgment, but perhaps the trial court was taking care not to invade the
jury=s province, given
the fact that the jurisdictional question was intertwined with the merits of
the case.  Although Miranda had
not been issued when this case was tried, we note that Miranda
thoroughly details the procedure that courts and litigants should follow in
examining questions of subject matter jurisdiction under the TTCA.  See 133 S.W.3d at 226B28.

B.      A
Deferential Standard of Review Applies to Jury Findings. 

Whether a court has subject matter
jurisdiction is a question of law.  Tex.
Natural Res. Conservation Comm=n v. IT-Davy, 74 S.W.3d 849,
855 (Tex. 2002).  Review of
determinations of subject matter jurisdiction occurs de novo.  Miranda, 133 S.W.3 d at 226.  However, Miranda recognizes that
reviewing jurisdictional determinations may require appellate courts to examine
the evidence supporting a claim.  Id.
at 228.  In such a circumstance, when a
trial court has examined the evidence and made a pre-trial ruling on subject
matter jurisdiction, Miranda requires reviewing courts to employ the
familiar summary judgment standard of review, holding that a reviewing court
must Atake as true all
evidence favorable to the nonmovant,@ and Aindulge every
reasonable inference and resolve any doubts in the nonmovant=s favor.@  Id. at 228.








This case, however, was tried to a jury,
and accordingly reaches us in a procedural posture different from Miranda,
and somewhat different from most other cases that raise challenges to subject
matter jurisdiction under the TTCA.[8]  As a consequence, Miranda does not
clearly dictate the standard of review we must apply to jury findings that bear
on the showing necessary to establish subject matter jurisdiction.  We believe, however, that a review of Miranda
illuminates the path we should take.

Miranda expressly holds
that the existence of a fact issue on the jurisdictional inquiry precludes a
court from granting a plea to the jurisdiction. 
The Court stated:

If the evidence creates a fact question regarding the
jurisdictional issue, then the trial court cannot grant the plea to the
jurisdiction, and the fact issue will be resolved by the fact finder.  However, if the relevant evidence is
undisputed or fails to raise a fact question on the jurisdictional issue, the
trial court rules on the plea to the jurisdiction as a matter of law.

                                                                          *
* *

                        This standard allows the
state in a timely manner to extricate itself from litigation if it is truly
immune.  However, by reserving for the
fact finder the resolution of disputed jurisdictional facts that implicate the
merits of the claim or defense, we preserve the parties= right to present the merits of their
case at trial.

133 S.W.3d at 227B28 (citations omitted). 
This reasoning makes clear that the court intends for jury findings to
play a role in determinations of subject matter jurisdiction when disputed
facts are relevant to the jurisdictional inquiry.








For this reason, we hold that the proper standard of review
to apply to the jury=s findings in this case is the familiar
legal and factual sufficiency standard for review of determinations by the
finder of fact.  Though not expressly
ruling on a question of subject matter jurisdiction, our court has employed
these standards to evaluate a jury verdict on the merits of a claim under the
TTCA in the past.  See, e.g., Harris
County v. Gibbons, 150 S.W.3d 877, 881 (Tex. App.CHouston [14th
Dist.] 2004, no pet.) (employing legal and factual sufficiency standards to
review a verdict under the TTCA).

Relying on Texas Department of Criminal Justice v. Miller, 51 S.W.3d 583,
587B88 (Tex. 2001), the University argues that this
Court must not defer to the jury=s verdict, or to reasonable
inferences that the jury may have drawn from the evidence produced at trial,
because this case involves a question of jurisdiction.  Miller does not stand for such a
proposition.  Rather, Miller
involved an interlocutory appeal after summary judgment proceedings, not a jury
verdict, and required only that the reviewing court examine Athe evidence submitted by the
parties.@ 
Id. at 587.  The University
does not have any support for its position that a court must disregard jury
findings, which in any event is contrary to the reasoning of Miranda.








We will accordingly employ the traditional
legal sufficiency review of the jury=s verdict in this
case under the legal sufficiency guidelines that the Texas Supreme Court has
recently reiterated and further explained in City of Keller v. Wilson,
168 S.W.3d 802 (Tex. 2005).[9]  See also Harris County v. Vernagallo,
__ S.W.3d __, No. 03-00619, 2005 WL 1771128 (Tex. App.CHouston [14th
Dist.] July 28, 2005, n.p.h.) (restating standard pursuant to Keller).  As an appellate court, we consider the
evidence in the light most favorable to the verdict and indulge every
reasonable inference that supports it.  Keller, 168 S.W.3d at 821B22.  The evidence is legally sufficient if it
would enable reasonable and fair-minded people to reach the verdict under
review.  Id. at 827B28.  We credit favorable evidence if reasonable
jurors could, and disregard contrary evidence unless reasonable jurors could
not.  See id.  The trier of fact is the sole judge of the
witnesses= credibility and the weight to be given
their testimony.  See id. at 819B21.  We cannot substitute our judgment for that of
the jury, so long as the evidence falls within the zone of reasonable
disagreement.  See id. at 821B22. But, Aif the evidence
allows of only one inference, neither jurors nor the reviewing court may
disregard it.@  Id.; see also Vernagallo, 2005 WL
1771128, at *5. 

We may sustain a legal sufficiency, or no
evidence, point if the record reveals one of the following:  (1) the complete absence of a vital fact, (2)
the court is barred by rules of law or of evidence from giving weight to the
only evidence offered to prove a vital fact, (3) the evidence offered to prove
a vital fact is no more than a scintilla, or (4) the evidence established
conclusively the opposite of the vital fact. 
Keller, 168 S.W.3d at 810.

C.      The
TTCA Grants a Limited Waiver of Sovereign Immunity.

Before examining the evidence in this
case, we begin by discussing the nature of sovereign immunity under the
TTCA.  The TTCA contains only a limited
waiver of sovereign immunity.  State
entities such as the University are ordinarily immune from suit and liability.[10]  The TTCA creates an exception to the general
rule of immunity Aonly in certain, narrowly defined
circumstances.@  Miller,
51 S.W.3d at 587.  The TTCA Adoes not waive
sovereign immunity for all negligence claims against governmental units.@  Id. 
There will accordingly be cases in which a state entity was clearly
negligent but will not be held liable.  See,
e.g., id. at 588 (failure to properly recognize and treat symptoms of
meningitis was Aallegation only of negligence,@ which does not,
without more, waive immunity under the TTCA).  

The TTCA specifically waives immunity
under the following circumstances. 
Section 101.021, entitled AGovernmental
Liability,@ provides:








A governmental unit in the state is
liable for:

(1) property damage, personal
injury, and death proximately caused by the wrongful act or omission or the
negligence of an employee acting within his scope of employment if:

(A) the property damage, personal
injury, or death arises from the operation or use of a motor-driven vehicle or
motor-driven equipment; and

(B) the employee would be
personally liable to the claimant according to Texas law; and

(2) personal
injury and death so caused by a condition or use of tangible personal or real
property if the governmental unit would, were it a private person, be liable to
the claimant according to Texas law.

Tex. Civ. Prac. & Rem.
Code ' 101.021.  This grant of immunity permits recovery
against the State for injuries in three general circumstances, including (1)
the use of motor driven vehicles, (2) the condition or use of personal
property, and (3) premises defects, or the condition of real property.  County of Cameron v. Brown, 80 S.W.3d
549, 554 (Tex. 2002).

Recovery for premises liability based on
the condition of real property is further restricted by section 101.022, which
in relevant part imposes upon the State the duty that a private landowner owes
a licensee:

(a) If a claim
arises from a premise defect, the governmental unit owes to the claimant only
the duty that a private person owes to a licensee on private property, unless
the claimant pays for the use of the premises.








Tex. Civ. Prac. & Rem.
Code ' 101.022(a).  This section provides the only means of
establishing premises liability against the State.  Miranda, 133 S.W.3d at 233 (stating
that the TTCA=s Ascheme of a
limited waiver of immunity from suit does not allow plaintiffs to circumvent
the heightened standards of a premises defect claim contained in section
101.022 by re-casting the same acts as a claim relating to the negligent
condition or use of tangible property@); State v.
Tennison, 509 S.W.2d 560, 561 (Tex. 1974) (rejecting claim that TTCA Acreates two entirely
separate grounds of liability@ involving
premises).

A private landowner=s duty to a
licensee Arequires that a landowner not injure a
licensee by willful, wanton or grossly negligent conduct, and that the owner
use ordinary care either to warn a licensee of, or to make reasonably safe, a
dangerous condition of which the owner is aware and the licensee is not.@  State Dep=t of Highways
& Public Transp. v. Payne, 838 S.W.2d 235, 237 (Tex. 1992).  Accordingly, the State may be liable for a
dangerous or defective condition on its premises if it either (1) injured a
person by willful, wanton or grossly negligent conduct, or (2) if State had
actual knowledge of the dangerous condition, the injured person had no such
knowledge, and the Stated failed to warn the person of the condition or make
the condition safe.  

Here, Brooks did not plead or prove that
the University was grossly negligent or that it injured him by willful or
wanton conduct.  Instead, Brooks
submitted this case to the jury only under the theory that a dangerous
condition existed on the premises that the University failed to warn him about
or make safe.  To sustain a claim under
this theory, Brooks was required to prove, among other things that the state
had actual knowledge of a dangerous condition and that he had no actual
knowledge of that condition.  See
State Dep=t of Highways & Public Transp. v.
Kitchen, 867 S.W.2d 784, 786 (Tex. 1993) (A[L]iability for a
premise defect requires a finding that the State actually knew of the dangerous
condition.@). 

D.      There Is No Evidence of Actual Knowledge
of the Dangerous Condition.








As the Texas
Supreme Court noted over thirty years ago in Tennison, A[a]ctual knowledge
rather than constructive knowledge of the dangerous condition is required@ to sustain a
premises claim against the State.  509
S.W.2d at 562 (AThe clear intent of the legislature was to
limit the State=s immunity in tort claims arising from
premise defects by imposing the same duty upon the State as that owed by
private persons to a licensee on private property.@).  This requirement has been reaffirmed through
the years and continues to be a limitation on the State=s liability under
the TTCA.  See, e.g., See City
of San Antonio v. Rodriguez, 931 S.W.2d 535, 536 (Tex. 1996) (city=s knowledge of a
leaky roof did not establish its awareness of a wet floor, which was the
dangerous condition that caused injury); Kitchen, 867 S.W.2d at 786 (AThe icy bridge in
this case was a premise defect, and since the jury failed to find that the
State was aware of the defect before the accident, the State is not liable to
plaintiffs.@); see also Creek v. Tex. State Dep=t of Highways
& Public Transp., 826 S.W.2d 797, 802 (Tex. App.CHouston [14th
Dist.] 1992, writ denied) (requiring proof of actual knowledge of damaged sign,
not knowledge of improper sign installation).

Proof of actual knowledge requires a
finding that the State knew of the dangerous condition that caused the injury,
not just proof that the State was aware of a related condition that may create
a danger at some time in the future.  In Rodriguez,
for example, the Texas Supreme Court reversed a jury verdict premised upon a
city=s knowledge that a
roof leaked, stating the Aleaky roof was not itself a dangerous
condition; it could only cause a dangerous condition.@  931 S.W.2d at 536.  The court therefore remanded for a
determination of whether there was actual knowledge of the dangerous condition
that had caused plaintiff=s injury, which was water on the
floor.  Id. at 536B37 (AOn retrial, the
jury should be instructed that the allegedly dangerous condition was the water
[plaintiff] claims was on the floor.@); see also
Dyall v. Simpson, 152 S.W.3d 688, 710 (Tex. App.BHouston [14th
Dist.] 2004, pet. filed) (holding by en banc court that employer=s awareness that
liquid was being pumped through a pipe did not establish awareness of leak in
pipe); Payne, 838 S.W.2d at 238 (holding that the fact a claimant knew
of a culvert=s existence did not establish as a matter
of law his actual knowledge regarding the dangerous location of the culvert).








The requirement that there be proof of
actual knowledge of the dangerous condition that caused the injury is
dispositive in this case.  Here, the
dangerous condition that caused Brooks= injury was the
entry of steam into the section of pipe that was being repaired.  See, e.g., Rodriguez, 931 S.W.2d at
537 (holding as a matter of law that the dangerous condition was the condition
that actually caused the injury, and not the preliminary Acondition [that]
could only cause a dangerous condition@); see also
Dallas County Health & Mental Retardation v. Bossley, 968 S.W.2d 339,
343 (Tex. 1998) (AProperty does not cause injury if it does
no more than furnish the condition that makes the injury possible.@).  Contrary to Brooks= arguments on
appeal, it was not the fact that the Evans Isolation Valve did not work, or the
presence of steam in the pipes generally,[11]
that was the dangerous condition. 
Rather, it was the fact that the Bypass Line was open and permitted
steam to enter the section of the pipe that was being repaired.  As in Rodriguez, which required a
showing of actual knowledge that water was on the floor, here, the necessary
showing was that the University had actual knowledge that steam would enter the
section of pipe that was being repaired.

There was no evidence at trial that
Watson, or anyone else at the University, actually knew steam would enter the
section of pipe being repaired.  Watson
testified that he believed he had shut off steam to the southwest campus, and
no one contradicted this testimony.  In
fact, as part of his case, Brooks established that Watson and Muse told Turner
and his employees that steam to the southwest campus had been shut off.  In addition, because Watson had turned the
steam off the previous day, any steam remaining in the pipe should have bled
off or cooled by the time the repair was to occur the following morning.  Finally, it was undisputed that the pipe that
was being repaired was cool to the touch, and actually dripped water as the
first bolt was removed, suggesting to everyone that it was not filled with
steam.  There is no evidence in the
record showing or suggesting that anyone actually knew steam would enter the
pipes near the broken Health Center Valve, but advised repair anyway.








Compounding the absence of direct evidence
of actual knowledge was Brooks= counsel=s argument to the
jury.[12]  Despite the clear requirements of the TTCA,
during closing, counsel repeatedly argued that the showing of Aactual knowledge@ could be
satisfied by demonstrating that the University should have been aware of
a particular condition.  Counsel argued
that Aactual knowledge
is something a reasonable person could or should have known under the
circumstances,@ and that Aactual knowledge
is knowledge that the person should have, could have, would have known with any
little effort.@ 
Counsel also argued as follows:

. . . dangerous
steam got into a pipe where it should not have been.  And if they would have, should have, could
have, would have known.  They should have
known.  Don=t get hung up on, AOh, I didn=t know steam was
in it.@  They should have known steam was in it.  Every bit of evidence offered in this case,
every bit of credible evidence tells you they should have known that line was
live.  They didn=t know it.  No doubt about it.  Aaron Watson is not a monster.  He=s not credible,
but he=s not a monster.  Neither is Charles Muse.  But they should have known.  Actual knowledge.  They should have known steam was in that
line. 

Finally, counsel urged the jury not to Aget hung up on a
technicality@ like actual knowledge. 








Notwithstanding his position at trial,
Brooks nevertheless insists on appeal that the University had actual knowledge
of the presence of steam in the pipe being repaired and claims that this knowledge
was established by inference.  We
disagree.  Considering all of the
evidence in the record, as we must when state of mind is at issue, Keller,
168 S.W.3d at 817B18 (mandating inclusive standard for Aconsciousness
evidence@), we hold that
none of the facts relied upon by Brooks creates an inference that the
University had actual knowledge that steam would enter the section of the pipe that
was being repaired.  As the Texas Supreme
Court stated in Keller, it is error to disregard evidence that is
relevant to a showing of knowledge if a reasonable jury could not have
disregarded such evidence.  See id.
at 829 (AThe critical
question in this case was the City=s state of mind C [plaintiffs] had
to prove that the City knew (not should have known) that flooding was
substantially certain.  A reviewing court
cannot evaluate what the City knew by disregarding most of what it was told.@).

1.       Knowledge
of the Bypass Line 

Brooks first points to the fact that
Watson knew of the existence of the Bypass Line 
to supply the inference that Watson had actual knowledge that steam
would enter the section of pipe being repaired. 
Although Watson claimed that he was not aware of this particular Bypass
Line, Turner testified that he believed Watson was aware of the Bypass Line
based on his presence when it was fabricated and installed.  Because it is the Aprovince of the
jury to resolve conflicts in the evidence,@ Keller, id.
at 820, on review, we assume that Watson knew of the Bypass Line=s existence.  

Watson=s knowledge of the
existence of the Bypass Line, however, does not establish actual knowledge
that, via the Bypass Line, steam would enter the pipes under repair.  There is uncontradicted testimony in the
record supporting the assertion that, because the cooking kettles were working,
the valve on the Bypass Line should have been turned off, rendering the Bypass
Line ineffective.  Turner testified that
the Bypass Line was created as a backup steam supply for the cooking kettles,
and that the Bypass Line=s valve should not have been open at the
time of the accident, because the cooking kettles were otherwise being supplied
with steam from the high pressure line. 
Turner also testified that the University=s third party
cooking contractors, such as Marriott, had access to this valve and sometimes
turned valves on and off for cooking purposes.  









This uncontradicted evidence undermines
Brooks= claim that
Watson, by knowing of the Bypass Line, necessarily knew that steam continued to
supply the low pressure line, and accordingly, the broken Health Center
Valve.  In order to support such a claim,
Brooks would have to establish that Watson knew the valve on the Bypass Line
was open.  But, there is absolutely no
evidence of this.  Rather, assuming
Watson was aware of the Bypass Line, he may have thought it was closed, as
Turner testified that it should have been. 
For the jury to conclude that Watson also knew the Bypass Line
was open would have required speculation. 
Given the uncontradicted evidence that the Bypass Line should have been
closed, no reasonable jury could have inferred that Watson=s knowledge of the
existence of the Bypass Line, without more, meant that Watson was also aware
that the Bypass Line was open and permitted steam to enter the low pressure
line where the broken valve would be repaired.[13]


          2.       The
Existence of Turbulence 








Brooks also claims that there was no
turbulence when Watson shut down the Southwest Isolation Valve and that this
fact should have alerted Watson that steam continued to flow to the southwest
campus.  As an initial matter, we
question whether there was testimony at trial actually showing that Watson
heard no turbulence when shutting down the Southwest Isolation Valve.  Watson testified that he heard turbulence,
and in response to an attempt to impeach him with his earlier deposition
testimony, the University=s counsel read into evidence part of
Watson=s deposition, in
which he stated that he Aheard some of [the turbulence] cease.@  We will assume for the purposes of review,
however, that this evidence could be viewed as indicating that Watson did not
hear turbulence when shutting the valve.

Even if Watson heard no turbulence when
shutting the Southwest Isolation Valve, an absence of turbulence when shutting
this valve does not establish actual knowledge of the dangerous condition,
i.e., that steam would enter the section of pipe being repaired.  The configuration of the University=s piping system
was undisputed, and demonstrates that the Bypass Line tied into the low
pressure line below the Southwest Isolation Valve.  Because of this configuration, whether the
Southwest Isolation Valve was open or closed, the Bypass Line, if open, could
continue to supply steam to the low pressure line (and hence, the Health Center
Valve).[14]  Therefore, it is not material whether Watson
heard turbulence when shutting the Southwest Isolation Valve, since this fact,
without more, has no bearing on whether the Bypass Line was open and permitted
steam to enter the low pressure line where the repair would be conducted.  Given these facts, whether Watson heard
turbulence or not upon shutting the Southwest Isolation Valve does not permit a
reasonable jury to infer that Watson, or anyone at the University, had actual
knowledge of the dangerous condition created by the open Bypass Line.

3.       Problems
with Watson=s Credibility








These conclusions are not altered by any
questions that the jury may have had concerning Watson=s
credibility.  We note that in conducting
our legal sufficiency review, we have assumed that the jury disbelieved Watson,
both with respect to whether he knew of the Bypass Line and whether he heard
turbulence when shutting the Southwest Isolation Valve.  However, even if questions about credibility
permit a jury to disregard a witness= testimony on a
given point, they do not permit a fact finder to disregard uncontradicted facts
that a reasonable juror could not ignore.  Keller, 168 S.W.3d at 820.  AJurors cannot
ignore undisputed testimony that is clear, positive, direct, otherwise
credible, free from contradictions and inconsistencies, and could have been
readily controverted.@  Id.  In this case, even assuming that the jury
disbelieved Watson and found that he was not a credible witness, this disbelief
does not overcome other, undisputed facts that were introduced into
evidence.  In particular, questions about
Watson=s credibility do
not undercut Turner=s testimony that a valve on the Bypass
Line, which should have been closed, was actually open.  Neither do such questions confer significance
on the aspect of turbulence, when it was undisputed that the steam was being
supplied from a source downstream of the isolation valve.

Put simply, A[c]rediting all
favorable evidence that reasonable jurors could believe and disregarding all
contrary evidence except that which they could not ignore,@ we hold that
there is no evidence that the University had actual knowledge of the presence
of steam in the pipes to be repaired.  See
Keller, id. at 830.  On the
evidence introduced at trial, a reasonable jury could not have found that the
University had actual knowledge of the dangerous condition that steam would
enter a section of pipe that would be repaired. 








We have carefully reviewed the evidence
supporting the element of actual knowledge in this case, because it is clear
that the Legislature insisted upon a showing of actual knowledge, rather than
constructive knowledge, as a factor limiting the State=s liability for
premises defects under the TTCA.  See Tex. Civ. Prac. & Rem. Code ' 101.022(a) &
(b); Payne, 838 S.W.2d at 237 (Apremise@ defects cases
require actual knowledge, though Aspecial@ defect cases do
not).  In light of this legislative
intent, expressed in the clear language of the statute, it would be error for
us to uphold a jury verdict finding negligence based on anything less than a
showing of actual knowledge.  As the
Texas Supreme Court noted in Bossley, Athe waiver of
immunity in the Tort Claims Act is not, and was not intended to be,
complete.  Arguments for application of
the Act that would essentially result in its waiver becoming absolute must
therefore be rejected as contrary to the Act=s fundamental
purpose.@  968 S.W.2d at 342.

                                                IV. 
Conclusion

For the foregoing reasons, we find the
evidence legally insufficient to establish that the University had actual
knowledge of the dangerous condition of steam entering the section of pipe that
would be repaired.  Absent proof of
actual knowledge, the University was entitled to sovereign immunity under the
Texas Tort Claims Act.  We sustain the
University=s second issue, reverse the trial court=s judgment, and
render judgment dismissing this case for lack of subject matter jurisdiction.

 

 

 

/s/        Eva M. Guzman

Justice

 

Judgment rendered
and Opinion filed October 20, 2005.

Panel consists of
Justices Edelman, Seymore, and Guzman. 

 

 

 











[1]  Brooks attempted to impeach Watson=s testimony on this point by
relying on earlier deposition testimony and maintains on appeal that Watson did
not hear any turbulence.





[2]  The Bypass Line is in the Alumni
Hall basement with several other pipes that are used for purposes including
electricity and hot and cold water. 
Watson testified that this Alumni Hall piping system has between 12 and
20 different pipes in the basement, with approximately 30 to 40 different
valves controlling them. 





[3]  Brooks did not
file a claim against Turner, so the only claim against Turner is the University=s.





[4]  Although the
University did not have written procedures in place prior to the accident in
this case, it drafted a AProcedure for Steam Shutdown/Start-Up@ after the accident that reflects procedures that the
University has historically followed. 
Considering this written procedure, Watson testified that he should have contacted Muse for
permission to shut off an isolation valve but that he simply decided to take
the required action himself.  In
addition, Watson admitted that procedures ordinarily would have required him to
Ableed@ the system after shut off, and
then confirm that the system was no longer pressurized.  He stated that he did not follow this
procedure, though, because the Health Center Valve was already leaking and
should have bled down completely by the next morning when the repair would
likely be made.  





[5]  Neither party
alleges any charge error on appeal.





[6]  At trial, the
case was submitted to the jury solely on a premises defect theory.  Accordingly, this is the only claim that we
evaluate on appeal.  See, e.g., County
of Cameron v. Brown, 80 S.W.3d 549, 554 n.2 (Tex. 2002) (reviewing only
premises defect claim where lower court and parties focused only on that claim,
despite broader allegations in the pleadings).





[7]  Although it is not necessary to our
determination that we must evaluate subject matter jurisdiction on appeal, see
Gibson, 22 S.W.3d at 850, we note that there is no danger of unfair
surprise arising from a jurisdictional ruling at this stage of the case.  A plaintiff unquestionably bears the burden
of pleading and proving facts demonstrating that immunity has been waived.  Dallas Area Rapid Transit v. Whitley,
104 S.W.3d 540, 542 (Tex. 2003).  Here,
the fact that the University was asserting immunity from suit, and challenging
the trial court=s jurisdiction to determine the
case, was apparent from its original answer. 
In addition, the University re-asserted its right to immunity pre-trial
in two sets of special exceptions, at the close of the evidence in a motion for
a directed verdict, and again, after the verdict, in a motion for judgment
notwithstanding the verdict. 





[8]  Many denials of sovereign immunity
reach appellate courts prior to any trial on the merits, via interlocutory
appeal.  See Tex. Civ. Prac. & Rem. Code ' 51.014 (2003); Sykes, 136
S.W.3d at 638 (AIf the trial court denies the
governmental entity=s claim of no jurisdiction, whether
it has been asserted as a plea to the jurisdiction, a motion for summary
judgment, or otherwise, the Legislature has provided that an interlocutory
appeal may be brought.@). 





[9]  In this case,
we review only for legal sufficiency.  It
is not clear that the University properly preserved any factual sufficiency
complaints that it may have had.  Brooks
urges that the University waived these complaints, and the University has not
disputed this argument.





[10]  It is
undisputed that the University, which is part of the A&M University system,
is a state entity. 





[11]  Without citing
any authority, Brooks argues that this court cannot determine the dangerous
condition because the University did not object to a jury charge that
instructed that Athe only allegedly dangerous condition was steam in
the pipes.@  However, this
instruction is not inconsistent with our determination that the dangerous
condition was the entry of steam into the section of pipe that was being
repaired, caused by the Bypass Line being open.





[12]  Counsel made
these arguments without objection from opposing counsel or correction by the
trial court.  However, we note this problematic
argument because, as a court reviewing a question of subject matter
jurisdiction, we are obliged to assure ourselves of jurisdiction irrespective of any concerns about
waiver.  See Gibson, 22 S.W.3d at
851.  We believe that statements made during closing
argument place the jury=s decision into context, but we note that they do not
affect the standard of review we apply to examine the evidence in this case.





[13]  Brooks relies
on Rodriguez and Keetch v. Kroger, 845 S.W.2d 262 (Tex. 1992),
for the proposition that knowledge of factors creating the dangerous condition
supports an inference of knowledge regarding the dangerous condition
itself.  This is not, however, what the
Court held in either case.  Rather, in Rodriguez
the Court held that, on remand, the plaintiff should be permitted to try to
establish that the City had actual knowledge of water on the floor.  931 S.W.2d at 537 (ADepending on the position of the leaks above the floor
and the amount of rain, the jury might have inferred that the person in charge
knew that there would be water on the floor.@).  Keetch, in contrast to this case,
permitted a finding of liability based on either actual or constructive
knowledge.  845 S.W.2d at 265 (AThe fact that the owner or occupier of a premises
created a condition that posed an unreasonable risk of harm may support an
inference of knowledge.  However the jury
still must find that the owner or occupier knew or should have known of the
condition.@)  As discussed
above, unlike Rodriguez or Keetch, this case involves
uncontradicted evidence that undercuts the claim that the University had actual
knowledge of the dangerous condition.





[14]  We also note
that, aside from Brooks= arguments about turbulence, there is no evidence in
the record that the Southwest Isolation Valve failed to close.