Affirmed in Part, Reversed and Remanded in Part and Memorandum Opinion
filed November 6, 2007








Affirmed in
Part, Reversed and Remanded in Part and Memorandum Opinion filed November 6, 2007.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00526-CV

____________

 

SIMPLIFIED DEVELOPMENT CORP. AND
JAMES P. CASHIOLA, Appellants

 

V.

 

JON GARFIELD, Appellee

 



 

On Appeal from the 295th
District Court

Harris County, Texas

Trial Court Cause No. 03-28787

 



 

M E M O R A N D U M   O P I N I O N

This is a case involving a breach of two contracts: an
employment contract and a stock option agreement.  Appellants/cross-appellees,
Simplified Development Corporation (ASimplified@) and James P.
Cashiola, appeal a judgment awarding damages and attorneys= fees to
appellee/cross-appellant Jon Garfield.  In turn, Garfield appeals the trial
court=s disregarding of
the jury=s answer finding
that Simplified=s breach of Garfield=s Stock Option
Agreement damaged Garfield in the amount of $3 million.  We affirm in part and
reverse and remand in part.








Factual and Procedural Background

I.        Cashiola
and Simplified

Simplified is a software company that produced software to
track telephone calls and simultaneously bill customers.  Simplified was wholly
owned by Cashiola, who was also Simplified=s president, chief
executive officer, and, through most of the relevant time period, its sole
director.  Cashiola was also heavily involved in Simplified=s day to day
operations, particularly its sales activities.  Cashiola=s primary goal
throughout the time period relevant to this appeal was to take Simplified
public.

II.       Simplified
Hires Garfield 

In 1998 Garfield, a former certified public accountant, was
employed as the Vice-President of Acquisitions for Coach USA,  Inc.  Beginning
in 1998, Cashiola worked for a year recruiting Garfield to join Simplified as
its chief financial officer.  Garfield, who was deeply involved in Coach USA=s initial public
offering, fit into Cashiola=s plan to take Simplified public.  Prior
to accepting Cashiola=s offer, Garfield investigated Simplified=s business and
assets.  Garfield learned that Simplified=s most significant
asset was its 47.5% ownership interest in Network Enhanced Telecom, LLP (ANET@).  NET was in the
pre-paid telephone card business.  NET was also a customer of Simplified as it
used Simplified=s software to track its customers= use of NET
telephone cards.  As a result of the nature of its business, NET generated
stable cash flow and was a profitable business.  Simplified benefitted from NET=s success as it
received revenue from NET=s use of Simplified=s software as well
as cash when NET distributed profits to its owners.  Garfield realized that NET
was Simplified=s most critical source of funds and was the key to
Simplified=s success. 








Following his due diligence, Garfield agreed to leave Coach
USA and become Simplified=s chief financial officer.  Garfield had
an Employment Agreement with Simplified in which Simplified agreed that if
Garfield was terminated without cause, it would pay him one year=s salary as well
as any unpaid bonus.  In addition to his Employment Agreement, Garfield had a
Stock Option Agreement (ASOA@) in which he
received options to purchase 300,000 shares of Simplified stock at a designated
price.  Under the SOA, Garfield received twenty percent of the options when he
signed his Employment Agreement and the remainder of the options would vest at
a rate of twenty percent per year of employment.  However, the SOA also
provided that in the event Garfield was terminated without cause or a AMajor Event,@ as defined in the
SOA, occurred, all options would immediately vest.[1]

III.      Simplified
Experiences Financial Problems

After Garfield joined the company, Simplified began to
experience financial difficulties as a result of problems with its software. 
Many of Simplified=s customers lodged complaints about the
performance of the software and refused to pay for the software.   Many of
these customer complaints grew out of Cashiola=s
misrepresentations regarding the software=s capabilities. 
These misrepresentations ranged from claiming the software supported
ninety-nine languages when it only supported three, to promising that
customized features could be developed in six weeks when it would actually take
at least a year.  As a result of these problems, Simplified could not collect
its receivables, its revenues were overstated, and it was unable to generate
positive cash flow. 








Simplified=s financial problems became so serious
that, in order to keep the doors open and the company moving toward its goal of
an initial public offering, Simplified had to start searching for outside
investors and loans.  Initially, Garfield procured a bridge loan for $4 million
from Silicon Valley Bank (ASVB@) to keep the
company operating until an investor was found.  With regard to the SVB loan,
Cashiola instructed Garfield to Ado whatever you
have to do to get it done.@  Without the August 2000 SVB loan,
Simplified would have been forced to close its doors as it would have been
unable to make its payroll.

Next, Simplified sought out investors willing to infuse
money into the company in exchange for a percentage of the ownership. 
Eventually, Bear Stearnes,  a group of venture capitalists Garfield had
previously dealt with while employed at another company, after some preliminary
discussions and investigation, gave Simplified a term sheet.  A term sheet was
a list of conditions that had to be met before Bear Stearnes would go forward
with the investment.  One of the conditions included in Bear Stearnes= term sheet
required Simplified to divest itself of its ownership interest in NET.  In
addition, Bear Stearnes also called for changes in Simplified=s management. 
After sending Simplified its term sheet, Bear Stearnes conducted its final due
diligence of Simplified and decided to reduce the amount it was willing to
invest in Simplified in exchange for a twenty-five percent ownership interest. 
At that point, Cashiola  made the decision to reject the Bear Stearnes term
sheet.  

IV.      Simplified
Spins Off NET








Even though Cashiola had rejected Bear Stearnes as an
investor in Simplified, he  decided to go through with the spinoff of
Simplified=s interest in NET.  Following the collapse of the Bear
Stearnes deal, Cashiola moved Simplified=s interest in NET
to Net Holdings, LLC, a company Cashiola had formed specifically for that
purpose.  The transfer of NET from Simplified to Net Holdings was completed on
August 22, 2000.  Cashiola was the sole owner of Net Holdings.  Prior to the
transfer, Garfield notified Cashiola that, because Simplified=s interest in NET
constituted more than fifty percent of Simplified=s assets, such a
move would qualify as a Major Event triggering paragraph 29 of Garfield=s SOA.  It was
undisputed at trial that the aggregate value of Garfield=s stock options
was less than $3 million at the time of the transfer; therefore, pursuant to
paragraph 29 of Garfield=s SOA, Simplified had to obtain Garfield=s written consent
to the transfer of the NET asset.  To obtain Garfield=s consent to the
transfer, Cashiola represented to Garfield that he would receive stock options[2]
in Net Holdings with the same terms and conditions as his stock options in
Simplified.  Based on that representation, Garfield consented to the transfer
of Simplified=s interest in NET to Net Holdings.  Cashiola never followed
through on his promise and Garfield never received the promised stock options
in Net Holdings.  Thus, Cashiola was able to move Simplified=s most valuable
asset from Simplified to a company he owned unencumbered by any stock options
held by another person.

V.      Simplified
Terminates Garfield

Within five months after Cashiola moved Simplified=s interest to Net
Holdings, Simplified terminated Garfield, ostensibly for cause.  In the letter
terminating Garfield,  Simplified gave two reasons for the termination: (1)
Simplified claimed Garfield had not protected Simplified on the loan from SVB;
and (2) Simplified blamed Garfield for the undisputed fact that Simplified
missed its revenue recognition projections.

VI.      Cashiola
Benefits From NET

Cashiola soon personally reaped the benefit of moving NET
to Net Holdings.  On June 7, 2001, Cashiola sold five percent of Net Holdings= interest in NET
to GoCodeBlue for $1 million.  In addition, Cashiola obtained a release of his
personal guaranty of a large loan made to Simplified by Vector, the investor
group that had ultimately invested in Simplified, by pledging Net Holding=s remaining
interest in NET to Vector.

 

 








VII.     Garfield=s Lawsuit Against
Simplified and Cashiola

Following his termination, Garfield filed suit against
Simplified and Cashiola.  Garfield sued Simplified for breach of his employment
contract, breach of his stock option agreement, and fraud.  In addition,
Garfield asserted Cashiola was responsible for Simplified=s contractual
obligations because he used Simplified to perpetrate an actual fraud on
Garfield and personally benefitted from that fraud.  Following trial, the jury
found that Simplified (1) breached Garfield=s employment
contract by terminating Garfield without cause and determined Garfield=s damages caused
by that breach to be $155,000; (2) breached Garfield=s SOA and that
Garfield=s damages
resulting from that breach were $3 million; and (3) did not commit fraud.  The
jury found that Cashiola was responsible for Simplified=s conduct because
he used Simplified to perpetrate an actual fraud on Garfield primarily for his
direct personal benefit.  As previously agreed, following the jury=s verdict, the
parties submitted the issue of Garfield=s attorneys= fees to the trial
court.  The trial court then rendered its final judgment on the jury=s verdict,
awarding Garfield $3,155,000 in damages, plus $307,975 in attorney=s fees, as well as
pre-judgment and post-judgment interest, and costs of court.

Appellants then filed a Motion to Disregard Certain Jury
Findings and for Judgment Notwithstanding the Verdict arguing, among other
things, that there was legally insufficient evidence supporting the jury=s $3 million
damage answer.  The trial court subsequently granted appellant=s motion on the
damages question only and entered an Amended Final Judgment in which it reduced
Garfield=s damages to
$155,000, but left the remainder of the original judgment intact, including
holding Cashiola jointly and severally liable to Garfield.  This appeal
followed.

 

 








Discussion

In this appeal, the parties each raise issues challenging
the trial court=s amended final judgment.  We initially
address those issues raised by appellants and then examine Garfield=s single issue on
appeal.[3]

I.        Did the
Amended Final Judgment Incorrectly Hold Cashiola Personally Liable for
Simplified=s Breach of Garfield=s Employment Agreement?

In response to Jury Question 12, the jury found that
Cashiola was responsible for Simplified=s conduct because
he used Simplified to perpetrate an actual fraud on Garfield primarily for his
own personal benefit.  The trial court entered judgment against Cashiola based
on this finding.  In their first two issues, appellants contend the judgment must
be reversed because the evidence supporting the jury=s answer to
Question 12 is legally and factually insufficient.  We disagree.

A.      Standard
of Review








When both legal and factual sufficiency challenges are
raised on appeal, we must first examine the legal sufficiency of the evidence.  City
of Houston v. Cotton, 171 S.W.3d 541, 546 (Tex. App.CHouston [14th
Dist.] 2005, pet. denied) (citing Trimble v. Tex. Dep=t of Protective
& Regulatory Serv., 981 S.W.2d 211, 217 (Tex. App.CHouston [14th
Dist.] 1998, no pet.).  In conducting a legal sufficiency review, we must
consider the evidence in the light most favorable to the verdict and indulge
every reasonable inference that supports it.  City of Keller v. Wilson,
168 S.W.3d 802, 821B22 (Tex. 2005); Harris County v.
Vernagallo, 181 S.W.3d 17, 24 (Tex. App.CHouston [14th
Dist.] 2005, pet. denied); Prairie View A & M Univ. v. Brooks, 180
S.W.3d 694, 705 (Tex. App.CHouston [14th Dist.] 2005, no pet.).  The
evidence is legally sufficient if it would enable reasonable and fair-minded
people to reach the verdict under review.  Keller, 168 S.W.3d at 827B28; Vernagallo,
181 S.W.3d at 24; Brooks, 180 S.W.3d at 705.  This court must credit
favorable evidence if reasonable jurors could, and disregard contrary evidence
unless reasonable jurors could not.  Keller, 168 S.W.3d at 827; Vernagallo,
181 S.W.3d at 24; Brooks, 180 S.W.3d at 705.  The trier of fact is the
sole judge of the witnesses= credibility and the weight to be given
their testimony.  Keller, 168 S.W.3d at 819; Vernagallo, 181
S.W.3d at 24; Brooks, 180 S.W.3d at 705. This court cannot substitute
our judgment for that of the jury, so long as the evidence falls within the
zone of reasonable disagreement.  Keller, 168 S.W.3d at 822; Vernagallo,
181 S.W.3d at 24; Brooks, 180 S.W.3d at 705.  But if the evidence allows
of only one inference, neither jurors nor the reviewing court may disregard it.
 Keller, 168 S.W.3d at 822; Vernagallo, 181 S.W.3d at 25; Brooks,
180 S.W.3d at 705.

This court may sustain a legal sufficiency, or no evidence,
point only if the record reveals one of the following: (1) the complete absence
of a vital fact; (2) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact; (3) the
evidence offered to prove a vital fact is no more than a scintilla; or (4) the
evidence established conclusively the opposite of the vital fact.  Keller,
168 S.W.3d at 810; Brooks, 180 S.W.3d at 705.








In reviewing factual sufficiency, we must examine the
entire record, considering both the evidence in favor of, and contrary to, the challenged
findings.  See Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406B07 (Tex. 1998); Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).  We may set aside the verdict for
factual sufficiency only if it is so contrary to the overwhelming weight of
evidence as to be clearly wrong and unjust.  See Ellis, 971 S.W.2d at
407; Nip v. Checkpoint Systems, Inc., 154 S.W.3d 767, 769 (Tex. App.CHouston [14th
Dist.] 2004, no pet.).  However, we may not substitute our judgment for that of
the jury, even if the evidence would clearly support a different result.  Nip,
154 S.W.3d at 769.

B.      The
Evidence is Legally and Factually Sufficient to Support the Judgment

The Texas Business Corporation Act provides that an owner
of a corporation is not liable for the contractual obligations of the
corporation unless a plaintiff establishes that the owner Acaused the
corporation to be used for the purpose of perpetrating and did perpetrate an
actual fraud on the obligee primarily for the direct personal benefit of the .
. . owner.@  See Tex. Bus. Corp. Act Ann. art. 2.21(A)(2)
(Vernon 2003).  Appellants contend there is legally and factually insufficient
evidence to establish that Cashiola: (1) used Simplified to perpetrate an
actual fraud on Garfield; and (2) directly benefitted from the fraudulent
conduct.








Appellants assert that to establish actual fraud as
required by the statute, Garfield had to prove that Cashiola (1) made a
material representation that was false; (2) knew the representation was false
when he made it or made it recklessly as a positive assertion without any knowledge
of its truth; (3) intended to induce Garfield to act on the representation; and
(4) Garfield relied on the representation and suffered damages.[4] 
Appellants specifically contend there is legally and factually insufficient
evidence that Cashiola knowingly or recklessly made a false representation to
Garfield with the intent to induce Garfield to act on the representation. 
Assuming without deciding those are the elements required to prove Aactual fraud@ in a case where a
plaintiff seeks to make an owner responsible for corporate debts, there is
legally and factually sufficient evidence establishing each challenged
element.  Cf. Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.,
C S.W.3d C, No.
14-06-00032-CV, 2007 WL 2386358, at *7 (Tex. App.CHouston [14th
Dist.] Aug. 23, 2007, no pet. h.) (stating, in a similar scenario, that actual
fraud involves dishonesty of purpose or intent to deceive).

Garfield testified that when he learned of the planned
transfer of Simplified=s interest in NET to another company owned
by Cashiola, he informed Cashiola the transfer constituted a AMajor Event@ under the terms
of his SOA.  Garfield then told Cashiola that Simplified had to either: (1)
obtain his consent to the transfer; or (2) pursuant to paragraph 29 of his SOA,
give him $3 million worth of Simplified stock options.[5] 
According to Garfield, Cashiola told him he did not have the $3 million, but,
he would give Garfield stock options in Net Holdings on the same terms and
conditions as his Simplified stock options. Garfield testified that, based on
this representation by Cashiola, he permitted the transfer to go forward. 
Garfield also testified he never received the Net Holdings stock options as
promised by Cashiola and was also unsuccessful in his efforts to exercise his
Simplified stock options in Simplified prior to his wrongful termination. 
Since Cashiola testified he did not make the representation claimed by
Garfield, it was the jury=s responsibility to weigh the credibility
of the witnesses and decide the weight to be assigned to their testimony.  See
City of Keller v. Wilson, 168 S.W.3d 802, 819 (Tex. 2005) (stating
the jurors, as the sole judges of the credibility of the witnesses and the
weight to give their testimony, can choose to believe one witness and
disbelieve another).   The jury decided this issue against Cashiola.  The
evidence of a false representation is legally and factually sufficient.








While a party=s intent is
determined at the time he made the representation, intent may be inferred from
a party=s subsequent acts
after the representation was made.  Weinberger v. Longer, 222 S.W.3d
557, 562 (Tex. App.CHouston [14th Dist.] 2007, pet. denied)
(citing Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex.
1986)).  Because intent to defraud is generally not susceptible to direct
proof, it invariably must be proven by circumstantial evidence.  Id.  ASlight
circumstantial evidence@ of fraud, when considered with the breach
of a promise to perform, is sufficient to support a finding of fraudulent
intent.  Id. at 562B63 (citing Spoljaric, 708 S.W.2d at
435).

Here, in addition to the evidence that appellants did not
perform the promise to deliver stock options to Garfield, there was evidence
that: (1) Cashiola refused to communicate with Garfield following the promise;
(2) Simplified terminated Garfield without cause when Garfield continued his
efforts to obtain his Simplified and Net Holdings stock options; and (3) Net
Holdings was able to sell five percent of its interest in NET free from any
restrictions that might have been imposed as a result of Garfield owning stock
options in Net Holdings.  This constitutes Aslight
circumstantial evidence@ of Cashiola=s fraudulent
intent not to perform his agreement to give Garfield Net Holdings stock
options.  Therefore, the evidence of fraudulent intent is legally and factually
sufficient.      








There was also legally and factually sufficient evidence
that Cashiola personally benefitted from the actual fraud.  On June 7, 2001 Net Holdings, which
was wholly owned by Cashiola, sold 5% of its Net IP interest to GoCodeBlue for
$1 million.  This constitutes legally and factually sufficient evidence that
Cashiola was the primary beneficiary of the fraudulent conduct.  Farr v. Sun
World Sav. Ass=n, 810 S.W.2d 294, 297B98 (Tex. App.CEl Paso 1991, no writ).  Appellants attempt to discredit this
evidence by contending that Cashiola received no personal benefit from this
transaction as he forgave loans he had made to Simplified.  Cashiola cites to section
5.9 of the Forbearance and Restructuring Agreement (the AForbearance Agreement@) between Vector Capital and other
investors in Simplified (the AVector Group@) on the one hand, and Simplified and Cashiola on the other,
in support of that claim.  The Forbearance Agreement is dated November 4, 2003,
more than two years after the sale of the Net IP interest to GoCodeBlue. 
Because of this more than two year gap between the sale to GoCodeBlue and the
Forbearance Agreement, as well as credibility issues surrounding Cashiola, the
jury was entitled to discredit appellants= assertions that Cashiola received no
personal benefit from the sale.

Cashiola, in exchange for assigning Net Holdings=s interest in NET
to Holdco, a company owned by the Vector Group, received a release on a
personal guaranty he had given on a $2.5 million loan made by the Vector Group
to Simplified.  This constitutes additional evidence that Cashiola received a
personal benefit from the transfer of Simplified=s interest in NET
to Net Holdings.  See Cass v. Stephens, 156 S.W.3d 38, 60 (Tex. App.CEl Paso 2004, pet.
denied) (holding that defendant received a personal benefit when he reallocated
oil well operating expenses to oil wells in which he owned a small percentage
and thereby reduced his level of expenses). 

Finally, appellants contend the jury=s negative answers
to jury questions 6 and 9 conflict with its affirmative answer to question 12. 
In question 6, the jury was asked if Simplified committed fraud against
Garfield A[i]n connection with entering into the Employment and
Stock Option Agreements.@  In question 9, the jury was asked
whether Simplified committed fraud against Garfield A[i]n connection
with the letter dated September 15, 2000.@[6]  In both
questions, the inquiry was not directed at the oral representation made by
Cashiola to induce Garfield to consent to the transfer of Simplified=s ownership
interest in NET and therefore they have no impact on the jury=s answer to
question 12.

Because the evidence is legally and factually sufficient
that Cashiola used Simplified to perpetrate an actual fraud on Garfield and
directly benefitted from the fraudulent conduct, we overrule appellants= first and second
issues on appeal.








II.       Did the
Trial Court Abuse its Discretion in the Admission of Evidence Regarding
Cashiola=s Character and Participation in
Events Leading to Simplified=s Financial
Problems?

In their third issue, appellants contend the trial court
erred in the admission of testimony by various witnesses regarding their: (1)
opinion of Cashiola=s character for untruthfulness; and (2)
knowledge of Cashiola=s involvement in Simplified=s sales  activities
and responsibility for Simplified=s financial
difficulties.  We address each contention in turn.

A.      Standard
of Review

The admission and exclusion of evidence is committed to the
trial court=s sound discretion.  Prestige Ford Co. v. Gilmore,
56 S.W.3d 73, 78 (Tex. App.CHouston [14th Dist.] 2001, pet. denied)
(citing City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex.
1995)).  We will reverse only if the trial court abused its discretion by
acting without reference to any guiding rules or principals or by acting
arbitrarily or unreasonably.  In re R. J. P., 179 S.W.3d 181, 184 (Tex.
App.CHouston [14th
Dist.] 2005, no pet.) (citing City of San Benito v. Rio Grande Valley Gas
Co., 109 S.W.3d 750, 757 (Tex. 2003)).  A party seeking to reverse a
judgment based on evidentiary error must prove that the error probably resulted
in an improper judgment, which usually requires the complaining party to show
that the judgment turns on the particular evidence excluded or admitted.  Prestige
Ford, 56 S.W.3d at 78.  We make this determination by reviewing the entire
record.  Id.

B.      The Trial
Court Did Not Abuse Its Discretion By Admitting the Contested Opinion Testimony








 During the trial, Garfield called several witnesses to
testify regarding their opinion of Cashiola=s character for
truthfulness or untruthfulness.  Each witness testified that, in the witness=s opinion,
Cashiola is dishonest and untrustworthy.  Appellants contend the trial court
abused its discretion in admitting this opinion testimony because, according to
appellants, the admission of such testimony violates Rule 404(a) of the Texas
Rules of Evidence.

In making this argument, appellants ignore the plain
language of Rule 404(a)(3) which provides: ACharacter Evidence
Generally.  Evidence of a person=s character or
character trait is not admissible for the purpose of proving action in
conformity therewith on a particular occasion, except: . . . (3) Character
of witness.  Evidence of the character of a witness, as provided in rules
607, 608 and 609.@  Tex. R. Evid. 404(a)(3) (emphasis in original).  We therefore look to
Rule 608 to determine if the opinion testimony at issue here complies with the
Rules of Evidence.  Rule 608(a)(1) provides: AOpinion and
Reputation Evidence of Character.  The credibility of a witness may be
attacked or supported by evidence in the form of opinion or reputation, but
subject to these limitations: (1) the evidence may refer only to character for
truthfulness or untruthfulness.@  Tex. R. Evid. 608(a)(1) (emphasis in original).  Cashiola was a witness
in the trial and therefore his credibility was at issue and could be attacked
by evidence in the form of an opinion regarding his character for truthfulness
or lack thereof.  That is exactly what the testimony did.  As the Rules of
Evidence specifically permit this type of testimony, the trial court did not
abuse its discretion when it admitted the opinion testimony attacking Cashiola=s reputation for
truthfulness.

C.      The Trial
Court Did Not Abuse Its Discretion By Admitting Testimony Regarding Specific
Prior Bad Acts By Cashiola








In their third issue, appellants also contend the trial
court abused its discretion when it allowed numerous witnesses to testify
regarding other alleged misrepresentations made by Cashiola.  These alleged
misrepresentations fall into two categories: (1) those made to Simplified
customers regarding the capabilities of Simplified=s software; and
(2) those made to Simplified employees.  Appellants assert the trial court=s decision
allowing both categories of testimony violated Rule  608(b) of the Texas Rules
of Evidence.  Garfield responds that the disputed testimony was admissible
under Rule 404(b) of the Texas Rules of Evidence.  We agree with Garfield.

Rule 404(b) provides, in relevant part, A[e]vidence of
other crimes, wrongs or acts is not admissible to prove the character of a
person in order to show action in conformity therewith.  It may, however, be
admissible for other purposes . . .@  Tex. R. Evid. 404(b).   Appellants claimed they
terminated Garfield with cause and this was a defense to Garfield=s claims under
both contracts.  Much of the contested testimony focused on Cashiola=s
misrepresentations to Simplified=s clients which
resulted in cancelled sales, refusals to pay, and ultimately, a decline in
Simplified=s revenues.  This evidence was not admitted to prove
Cashiola=s character or
actions in conformity with that character but to rebut appellants alleged cause
for terminating Garfield.  The evidence demonstrated that Garfield was not
responsible for Simplified=s revenue issues, but Cashiola, at least
in part, was, due to his misrepresentations to customers. The trial court did
not abuse its discretion when it admitted this testimony.  See McLellan v.
Benson, 877 S.W.2d 454, 457 (Tex. App.CHouston [1st
Dist.] 1994, no writ) (holding that if the proponent of the evidence persuades
the trial court that the evidence is relevant to a  material issue, the court
may rule the evidence admissible). 

Another purpose for which evidence of wrongs or other bad
acts is admissible under Rule 404(b) is to prove intent.  Tex. R. Evid. 404(b).  The remainder of the
contested testimony related to Cashiola fraudulently inducing other Simplified
employees with promises of bonuses, commissions, stock options, and warrants. 
Cashiola=s pattern of
defrauding other employees corroborated Garfield=s testimony that
Cashiola perpetrated a fraud upon him and thus was admissible under Rule 404(b)
to show Cashiola=s fraudulent intent.  Once again, the
trial court did not abuse its discretion when it admitted this testimony.   Id. 
We overrule appellants= third issue.

 








III.      Did the
Trial Court Err in its Determination of the Amount of Garfield=s Recoverable
Attorneys= Fees? 

In their
fourth issue, appellants contend the trial court erred in its award of
attorneys= fees because: (1) Garfield failed to segregate his fees between
recoverable and non-recoverable claims; and (2) the hourly rate sought by
Garfield was higher than the usual and customary fee because Garfield failed to
properly employ the use of legal assistants to reduce  costs.

Texas
law does not allow the recovery of attorneys= fees unless they are authorized by
statute or contract.  Tony Gullo Motors I, L. P. v. Chapa, 212 S.W.3d
299, 310 (Tex. 2006).  Section 38.001 of the Texas Civil Practices &
Remedies Code provides that a successful party in a breach of contract action
may recover reasonable and necessary attorneys= fees.  Mullins v. Mullins,
889 S.W.2d 550,  554 (Tex. App.CHouston [14th Dist.] 1994, writ denied) (citing Tex. Civ.
Prac. & Rem. Code Ann. ' 38.001 (Vernon 1997)).  Attorneys= fees are not recoverable in an
action in tort however.  Knebel v. Capital Nat=l Bank, 518 S.W.2d 795, 803B04 (Tex. 1974).  As a result, parties
seeking to recover attorneys= fees have always been required to segregate fees between
claims where fees are recoverable and claims where they are not.  Chapa,
212 S.W.3d at 311.  An exception exists to this general duty to segregate if
the claims are inextricably intertwined.  Id.  To establish that
attorneys= fees are inextricably intertwined, the party seeking the recovery of
attorneys= fees must establish that discrete legal services advanced both a recoverable
and an unrecoverable claim.  Id. at 313B14.








During
oral argument, counsel for Garfield conceded that, because the trial in this
case predated Chapa, the evidence submitted to the trial court did not
meet the requirements set forth in that case to establish that Garfield=s claims were inextricably
intertwined.  Therefore, we sustain appellants= fourth issue.[7]

IV.      Did the
Trial Court Correctly Disregard the Jury=s Answer Finding
Garfield Was Damaged in the Amount of $3 Million as a Result of Simplified=s Breach of the
Stock Option Agreement?

Following the trial court=s entry of the
initial final judgment in this case, appellants filed their Motion to Disregard
Certain Jury Findings and for Judgment Notwithstanding the Verdict.  Appellants
argued, in part, there was no evidence to support the jury=s finding that
Garfield suffered $3 million damages as a result of Simplified=s breach of the
SOA.  The trial court granted that portion of the motion and removed the $3
million damages from its amended final judgment.  In his single cross-issue on
appeal, Garfield contends the trial court erred when it partially granted
appellants= Motion to Disregard Certain Jury Findings and for
Judgment Notwithstanding the Verdict and reduced his damages by $3 million.

A.      Standard
of Review

In order to uphold a trial court=s judgment
notwithstanding the verdict, an appellate court must determine that no evidence
supports the jury=s findings.  Apache Corp. v. Dynegy
Midstream Services, Ltd., 214 S.W.3d 554, 558 (Tex. App.CHouston [14th
Dist.] 2006, rule 53.7(f) motion granted).  The final test for legal
sufficiency must always be whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review.  Id. 
Under the properly applied scope of review, appellate courts must review the
evidence in the light most favorable to the verdict, crediting favorable
evidence if reasonable jurors could, and disregarding contrary evidence unless
reasonable jurors could not disregard such evidence.  Id. at 558B59.








A judgment notwithstanding the verdict is proper in the
following circumstances: (1) a defect in the opponent=s pleadings makes
the pleadings insufficient to support a judgment; (2) the evidence conclusively
proves a fact that establishes a party=s right to
judgment as a matter of law; or (3) the evidence offered on a cause of action
is insufficient to raise an issue of fact.  Id. at 559.  If there is
sufficient evidence to support the jury=s findings, the
judgment notwithstanding the verdict should be reversed.  Id.

B.      The Trial
Court Did Not Err When it Disregarded the Jury=s $3 Million
Damage Answer

While Garfield contends in his brief that he Adid not pull the
$3 million figure from thin air,@ the evidence at
trial was undisputed that the aggregate value of his stock options at the time
of the transfer of NET to Het Holdings, was less than $3 million.  Indeed,
there was no evidence from any witness on exactly what the value of Garfield=s stock options
was. Instead, Garfield relied entirely on paragraph 29 of his SOA as the
measure of his damages.  Paragraph 29, provides A[t]he Company agrees that it will not
consummate a Major Event unless the aggregate value of the Option Shares to
Employee is equal to $3,000,000 or greater, without the prior written consent
of Employee.@ Garfield=s reliance on
paragraph 29 to support his damage calculation is misplaced.








Neither party contends that the SOA agreement was
ambiguous, and we agree it is not, therefore, we construe the SOA as a matter
of law.  Material P=ships, Inc. v.
Ventura, 102 S.W.3d 252, 258 (Tex. App.CHouston [14th
Dist.] 2003, pet. denied).  Paragraph 29 unambiguously creates a consent right
in favor of Garfield at any time when the value of his stock options was below
the designated value of $3 million.  There is no language found in paragraph 29
that guaranteed Garfield $3 million if a AMajor Event@ occurred or that
the value of those stock options would ever reach $3 million.  Because the SOA
is not ambiguous, Garfield=s testimony on his understanding of
paragraph 29 is not relevant and therefore constitutes no evidence supporting
the jury=s damage finding. 
See id. (stating only after a court first determines a contract is
ambiguous may the court consider the parties= interpretations
and admit extraneous evidence to determine the true meaning of the
instrument).  Because there was no evidence supporting the jury=s $3 million
damage finding, the trial court correctly granted appellants= Motion to
Disregard Certain Jury Findings and for Judgment Notwithstanding the Verdict. 
Accordingly, we overrule Garfield=s single issue on
appeal.

Conclusion

Since we
sustained appellants= fourth issue on appeal, we reverse that portion of the trial
court=s amended final judgment awarding
attorneys= fees to Garfield and remand that issue to the trial court for
proceedings consistent with this opinion. Because we overruled appellants= first three issues on appeal, as
well as Garfield=s single cross-issue on appeal, we affirm the remainder of
the trial court=s amended final judgment.

 

 

 

 

 

/s/      John S. Anderson

Justice

 

 

 

 

Judgment rendered
and Memorandum Opinion filed November 6, 2007.

Panel consists of
Chief Justice Hedges and Justices Anderson and Seymore.  









[1]  In relevant part, paragraph 23 of the SOA defined a AMajor Event@ as
occurring if Athe stockholders of [Simplified] shall approve a plan
of complete liquidation of [Simplified] or an agreement for the sale or
disposition by [Simplified] of all or a substantial portion of [Simplified=s] assets (i.e. 50 percent or more of the total assets
of [Simplified]).@  Paragraph 29 of the SOA provides: AThe Company agrees that it will not consummate a Major
Event unless the aggregate value of the Option Shares to Employee . . . is
equal to $3,000,000 or greater, without the prior written consent of Employee.@





[2]  We understand that limited liability companies do
not issue stock but instead have membership interests.  See Tex. Rev.
Civ. Stat. Ann. art. 1528n, ' 4.01 (Vernon
Supp. 2006).  However, the parties referred to the promised option to purchase
an interest in Net Holdings, LLC as Astock
options@ and we follow their lead here.





[3]  Appellants do not challenge those portions of the
amended final judgment holding Simplified liable for breaching Garfield=s Employment Agreement. Appellants, in their Reply
Brief, did raise an alternative issue contending that the evidence supporting
the jury=s finding that Simplified breached Garfield=s SOA is legally and factually insufficient.  However,
because a party cannot raise a new issue for the first time in a reply brief,
we do not address that issue.  Tex. R. App. P. 38.3; Dallas Co. v. Gonzales,
183 S.W.3d 94, 104 (Tex. App.CDallas 2006,
pet. denied).





[4]  Question 12 asked:

 

Is James Cashiola responsible for the conduct of
Simplified?

 

James Cashiola is responsible for the conduct of
Simplified if James Cashiola used Simplified for the purpose of perpetrating
and did perpetrate an actual fraud on Jon Garfield primarily for the direct
personal benefit of James Cashiola.

 

Answer AYes@ or ANo@





[5]  We address Garfield=s interpretation of paragraph 29 of his SOA in part IV below.





[6]  Appellants contend the September 15, 2000 letter is
connected with Garfield=s termination.  We disagree with this contention as
Garfield was not terminated until January 22, 2001. 





[7]  Because we sustain appellants= fourth issue based on Garfield=s failure to segregate his attorneys= fees, we need not address appellants other contention
that Garfield=s legal fees were too high because of a failure to use
legal assistants.  Tex. R. App. P. 47.1.